54 F.3d 592
 Kathy Lynn HENDERSON, for herself and as natural guardian
and parent of Korinne Nichole EPSTEIN, a minor
child, Plaintiff-Appellee,
v.
MOHAVE COUNTY, ARIZONA; Joe Cook, Mohave County Sheriff
S.D.; Scott Durst, Mohave County Deputy; Nick Ingrassi;
Wilbur Hadlock; K. Jackson and John Epstein, Mohave County
Deputies, Defendants-Appellants.
 No. 93-16735.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 15, 1995.
Decided May 3, 1995.
As Amended June 6, 1995.
 
 William R. Jones, Jr. and David C. Lewis, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants-appellants.
 Charles B. Gustafson, Flagstaff, AZ, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Arizona.
 Before: FLETCHER, REINHARDT and NOONAN, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 Mohave County Sheriff S.D. "Joe" Cook and associated deputy sheriffs (collectively the sheriffs) and Mohave County appeal the denial by the district court of qualified immunity. The action was brought against them by Kathy Lynn Henderson for herself and as the natural guardian and parent of her daughter Korinne Nichole Epstein. Henderson alleged that she and her daughter had on two occasions been unlawfully subjected to seizure by the sheriffs. We affirm the judgment of the district court denying immunity to the sheriffs. We dismiss the County's appeal for want of jurisdiction.
 
 FACTS
 
 2
 Kathy Lynn Henderson was married to John Epstein; they are the parents of Korinne Nichole Henderson Epstein, born September 10, 1976. The couple was divorced in 1978 and custody of Korinne was awarded to Kathy. On September 17, 1985, physical custody of Korinne was transferred from Kathy to John in accordance with a stipulation between them; the stipulation was approved by an order of the Superior Court of Orange County, California (the 1985 decree). In 1986, Kathy petitioned to resume custody and was granted it by a commissioner acting under authority of the Superior Court of Orange County, California (the 1986 decree). According to the 1986 decree, John was granted "reasonable visitation" under the supervision of Kathy or another competent adult. He was also ordered to stay at least 100 yards from Kathy's residence and from Korinne's school. Thereafter, Korinne lived with her mother in Kingman, Mohave County, Arizona and attended junior high in Kingman.
 
 
 3
 On April 12, 1991, two deputy sheriffs appeared at Kathy's home and advised her that they wanted to remove Korinne from her custody. They referred to the 1985 decree, which, 90 minutes before their arrival, had been domesticated in Arizona by being filed in Mohave County by John. Kathy told the officers that the 1985 decree had been superseded by the 1986 decree and showed one of the officers the 1986 decree. The officer ignored what Kathy showed him and he told her that he would see that Mr. Epstein got custody.
 
 
 4
 Kathy and the officers, each in their own cars, proceeded to Korinne's school and went to the dean's office, where the officers again produced the 1985 decree. Kathy "yelled" at the officers and then went outside the school to confront her ex-husband who was waiting for Korinne to be delivered to him. An officer warned Kathy that any further yelling would result in her arrest for disturbing the function of the school. She reentered the school and began "yelling" at the dean. She was then arrested for disorderly conduct in violation of A.R.S. Sec. 13-2904.
 
 
 5
 The officers took custody of Korinne. She was not permitted to speak to her mother. She told the deputies that she did not want to leave Kingman and that she wanted to remain with her mother. They refused to listen to her and delivered her to her father who returned her to California, where she remained for over two months.
 
 
 6
 In June, Korinne managed to rejoin her mother in Kingman. At the instruction of John the Mohave County Sheriff again sought to pick her up. Two different deputies called on Kathy and demanded custody of her daughter. Again Kathy showed them the 1986 decree and read aloud the relevant portions. The deputies disregarded the decree and arrested Kathy for "custodial interference" in violation of A.R.S. Sec. 13-1302, a felony. She was kept in jail for the next 16 hours. The deputies took custody of Korinne and put her in a juvenile detention center where she remained until her father arrived and took her with him to California.
 
 
 7
 Seven days later Kathy, now out of jail, was able to get Korinne back from California. Kathy was not prosecuted for any part of her conduct in April or in June.
 
 PROCEEDINGS
 
 8
 On her own behalf and on behalf of Korinne, Kathy sued Mohave County, the sheriffs, and her ex-husband John for violation of her civil rights under 42 U.S.C. Sec. 1983. Mohave County and the sheriffs moved for summary judgment on the ground that no constitutional violation was established by the facts of the case and that, if it were, the individual defendants were entitled to qualified immunity. The district court denied the motion. The County and the sheriffs appeal.
 
 ANALYSIS
 
 9
 The Interlocutory Appeal of a Local Government in Sec. 1983 Cases
 
 
 10
 The district court's denial of summary judgment against the county does not qualify as a "collateral order," and there is no "pendent appellate jurisdiction" over the county's claim. Swint v. Chambers County Commission, --- U.S. ----, ----, 115 S.Ct. 1203, 1207, 131 L.Ed.2d 60 (1995). Consequently, the appeal of the County must be dismissed for lack of jurisdiction.
 
 The Sheriffs' Appeal
 
 11
 The standard for qualified immunity is definitively established by Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The officers are entitled to immunity if they "reasonably but mistakenly" believed that they had probable cause to arrest Kathy and to take Korinne into custody. Probable cause in fact existed if "at the moment the arrest was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that those arrested had violated the law. Id. at 228, 112 S.Ct. at 537, quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Immunity does not protect "the plainly incompetent." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). In their opening brief, the sheriffs stated that the Plaintiff:
 
 
 12
 did not controvert the sheriff's deputies' description of the events leading up to the two arrests, other than Plaintiff's assertion that she showed sheriff's deputies a copy of the 1986 California, undomesticated, order on each of the two occasions. For purposes of the motion and this appeal, Defendants will assume this to be true.
 
 
 13
 Accordingly, for the purpose of this appeal, we take all facts as uncontroverted.
 
 
 14
 The sheriffs argue that officers could have reasonably, if mistakenly, believed that the 1985 order was enforceable because it was domesticated in Mohave County, and an Arizona statute provides that a custody decree so filed "has the same effect and shall be enforced in like manner as a custody decree rendered by a court of this state." A.R.S. Sec. 8-415(A). The officers say that to have found that the 1986 decree superseded the 1985 decree would have required them to engage in a conflict-of-laws analysis; as officers of the superior court of Arizona they simply carried out the 1985 decree which Arizona law said should be treated like an Arizona court decree.
 
 
 15
 There is a rough and ready simplicity to the sheriffs' argument. They were not, however, called upon to engage in a conflict-of-laws analysis. They were simply asked to take note of a decree of the Superior Court of Orange County dated 1986, which overrode a decree of the Superior Court of Orange County dated 1985. The conflict was not of laws, but of dates. A reasonable policeman would have seen that a court decree dated 1986 trumped a decree of the same court dated 1985. More than a dash of misogyny affected the first two officers, both male, who so stubbornly refused to heed Kathy's explanation or acknowledge Korinne's desire to talk to her mother before she was whisked away.
 
 
 16
 Deaf as they acted to the explanation offered by Kathy, blind as they appeared to the later decree, the sheriffs did not act reasonably. We are well past the wild west stage of this country where strong, silent, and totally unsophisticated deputies can override a mother's reasoned attempt to retain custody of her daughter given her by a court order. The exercise of prudence by law enforcement officers demands more than mechanical reliance on a piece of paper. These deputies had put in their faces the evidence any prudent person would have taken into account: evidence that Kathy had lawful custody of Korinne and that John was attempting to manipulate the officers to make an end run around the Orange County Superior Court. The entire jurisprudence of qualified immunity is premised on the proposition that well-trained, competent police officers will be aware of what constitutional rights have been established. An officer capable of making such a reasonable determination must be presumed to have the ability to tell when a court decree has been overruled.
 
 
 17
 The sheriffs, nonetheless, maintain that at least they had a reasonable belief of probable cause to arrest Kathy for "yelling" at the school dean. On this record we are unable to judge the force of this contention. The verb "to yell" is used today by many persons to indicate any elevation in the tone of voice directed by the speaker to accomplish a result that the hearer does not want to have accomplished. We cannot say on this record that Kathy's "yelling" at the school amounted to a disturbance of the peace in violation of A.R.S. Sec. 13-2904. The experienced federal judge who heard the case in the district court, himself a former state court judge in Arizona, did not find that the yelling that he notes in his statement of facts amounted to probable cause for arrest. On the record before us, we have no reason to doubt his ruling.
 
 
 18
 As for the taking of Korinne twice into custody, once to send her back to California, once to put her in juvenile detention prior to release to her father, no excuse at all appears on the record. Unreasonably, the deputies ignored the mother's court order and explanations and refused to listen to the fourteen-year-old daughter's expostulations and requests to stay with her mother. The second set of deputies had no more basis for believing that they were acting lawfully than did the first. Reasonable police officers would not have been deaf and blind before the two women insisting that they were wrong.
 
 
 19
 AFFIRMED.