David K. HUSKEY, Plaintiff–Appellee,

v.

CITY OF SAN JOSE;  Joan Gallo;
George Rios;  Ralph Greene,
Defendants–Appellants.

No. 99–15123.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 2000

Filed Feb. 24, 2000

Morgan, San Jose, California, for the plaintiff-appellee.

Before: VAN GRAAFEILAND,[1] ALARCON, and SILVERMAN, Circuit Judges.

ALARCON, Circuit Judge:

Defendants Joan Gallo ("Gallo"), George Rios ("Rios"), and Ralph Greene ("Greene") (collectively, "the individual defendants") appeal from the denial of their motion for a summary judgment on the basis of qualified immunity in David Huskey's ("Huskey") 42 U.S.C. § 1983 action against them and the City of San Jose ("City"). We have jurisdiction over the interlocutory appeal filed by the individual defendants pursuant to *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We conclude that the facts Huskey alleged were insufficient as a matter of law to support his § 1983 claims. We therefore reverse the denial of the individual defendants' motion for a summary judgment on Huskey's § 1983 claims on the basis of qualified immunity. Because the denial of the City's motion for a summary judgment on the § 1983 claims is inextricably intertwined with the constitutional issues presented in the appeal of the individual defendants, we conclude that we have jurisdiction over the City's interlocutory appeal and reverse.

I

"[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitch-*

Christian B. Nielsen, Rebecca L. Moon, Robinson & Wood, Inc., San Jose, California, for defendants-appellants.

Nora Rousso (on the briefs) and James McManis (argued). McManis, Faulkner &

1. Honorable Ellsworth A. Van Graafeiland, Senior United States Circuit Judge, for the Second Circuit, sitting by designation.

*ell,* 472 U.S. at 530, 105 S.Ct. 2806. Even though the parties dispute some of the facts, this court has jurisdiction over the legal question the individual defendants have raised regarding whether Huskey's version of the facts can sustain a claim that his clearly established constitutional rights have been violated. *See Brewster v. Board of Educ.,* 149 F.3d 971, 976–77 (9th Cir.1998) (citing *Mitchell,* 472 U.S. at 528 n. 9, 105 S.Ct. 2806). We accept as true for purposes of this appeal Huskey's version of the facts. *See id.* at 977 ("In resolving the appeal, we simply assume the disputed facts in the light most favorable to [the plaintiff], and then decide, under those facts, whether the [government] officials violated any of [the plaintiff's] clearly established constitutional rights.") (citing *Johnson v. Jones,* 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)).

## II

In January 1986 Huskey began work as a Deputy City Attorney in the San Jose City Attorney's office ("the Office"). In 1993, he was promoted to Senior Deputy City Attorney. During the time period in issue, Gallo was the City Attorney, Rios was the Assistant City Attorney, and Greene was Chief Trial Attorney. Greene was Huskey's direct supervisor.

In March 1994, Huskey and Greene worked together in the Office on *Ward v. City of San Jose,* 967 F.2d 280 (9th Cir. 1992) which was considered to be an important case by Huskey and Greene. Approximately one week before the trial was scheduled to begin, Gallo called Huskey at home one night and told him that Greene was an alcoholic. Gallo told Huskey she feared Greene might be in the midst of a relapse. Gallo said that Greene had been convicted of driving under the influence of alcohol roughly one year before and that his driver's license had been suspended. She expressed concern about Greene's well-being and also expressed her respect for Greene's ability as a lawyer. She asked Huskey to report to her any suspicion he may have that Greene had been drinking. Huskey informed Gallo that she was putting him in an awkward position. He was reluctant to monitor Greene's drinking because he feared that Greene might find out and resent Huskey's role as an informer.

During the *Ward* trial, Greene participated in a conference with Huskey and an expert witness. Greene appeared giddy and acted inappropriately. Huskey took Greene aside and suggested that he go home to get ready for the next day's trial proceedings. The situation was extremely awkward, but Greene did leave. Because Huskey believed that Greene had been drinking, he called Gallo that night and told her about the incident. Gallo thanked Huskey for letting her know and told him that she would "take care of it." Greene did not appear intoxicated to Huskey for the rest of the *Ward* trial.

Huskey did not immediately notice a change in his relationship with Greene. In fact, Huskey received what he viewed as an "excellent" annual performance evaluation from Greene in late 1994. The two men did not again work or try another major case together.

In the spring of 1995, Huskey began to detect subtle changes in his relationship with Greene. For example, Greene attempted to withdraw one week before trial from active participation in a case he was to try with Huskey. Greene also began to trivialize Huskey's cases, suggesting that they were "B.S." cases.

In early November 1995, Greene met with Huskey to discuss his annual performance evaluation. The evaluation was somewhat less favorable than Huskey's previous evaluation, with a decrease in his average rating on a number of different aspects of performance from 8.3 to 7.7 on a 10–point scale. When Huskey asked for an explanation, Greene responded that there had been a problem of grade inflation in the past.

In an e-mail addressed to Huskey and Gallo dated November 14, 1995, Greene harshly criticized a motion for a summary judgment that Huskey had drafted. Greene called the motion "burdensome, oppressive and unintelligible." Greene pointed to specific problems with the motion, noted changes he had previously instructed Huskey to make that Huskey had not made, and criticized Huskey for timing his work on the case in such a manner that neither Greene nor Gallo would have an opportunity to make editorial suggestions.

In an April 1996 conference call, Huskey told Greene that he was concerned that a witness for the City might lie on the stand in an upcoming trial. Huskey reported that he had told the witness he could not lie, Greene asked: "Why not?" and then laughed. Greene began to yell at Huskey: "Why can't you act like an attorney? Why can't you be more of an advocate?" Huskey inferred from this criticism that Greene would be very angry at him if the witness testified adversely to the City.

In July 1996, because of his concern over Greene's growing hostility, Huskey interviewed with a law firm. He informed Gallo by e-mail that he had done so. She responded with an e-mail thanking him for informing her and stating: "Of course we want you to stay!" Based on this reassurance, Huskey did not pursue his efforts to obtain employment with the firm. He did not receive an offer of employment from the firm.

On October 7, 1996, Huskey attended a meeting of the settlement conference committee to discuss one of his cases. During the meeting, Gallo told Huskey she was reassigning the case to Greene. When Huskey called her at home that night to ask why, Gallo informed him that she had lost confidence in him. He asked her why she had lost confidence in him. Gallo informed Huskey that he had made mistakes in how he handled his cases, specifically citing two instances where Huskey allowed cases to proceed before a magistrate judge when he could have elected to proceed before a federal district judge. When Huskey asked if this meant that he should leave the Office, Gallo responded affirmatively. Huskey told her he would begin to look for another job. It was Huskey's understanding that he would be allowed to stay with the Office until he found suitable employment.

The next morning, Huskey told Rios about his conversation with Gallo. He informed Rios that he would be looking for another job. Rios then began reassigning Huskey's police misconduct cases to other lawyers. Huskey was assigned minor subrogation and contract cases. Huskey was also asked to perform what he viewed to be the menial task of sitting through a four-day trial in order to be able to report the judge's decision to Gallo. When Huskey confronted Rios about the change in his assignments, Rios told him that management had "lost confidence" in him and was concerned about the way he evaluated his cases. Even with the reassignments, Huskey still had three cases set for trial in January 1997.

Huskey alleged that he found the situation in the Office "very stressful" and was troubled that Gallo, Greene, and Rios were "turning such a cold shoulder" to him. On November 20, 1996, he wrote a memorandum to Gallo, Greene, and Rios stating that he knew Greene had turned against him because of what he had told Gallo about Greene during the *Ward* trial but that he did not know why Gallo and Rios had done so. Huskey requested an explanation.

On December 3, 1996, Gallo responded with a memorandum in which she stated that she, Rios, and Greene had criticized Huskey for many years about his approach to cases. Gallo praised Huskey's writing and research skills as "excellent" but noted that his work had recently included excessive and irrelevant detail and required too much editing by others. She also noted that his files reflected a "pattern of sloppiness as well as a failure to call issues to

our attention in a timely manner." Gallo concluded:

> David, in sum, you are a good person, a hard worker, and you have a number of skills and talents. On the other hand, you seem to be paralyzed by a fear of losing, you focus only on the weaknesses and not the strengths of your cases. You regularly get caught up in one case and let important decisions slip in others. This has even affected your ability to write motions. Unfortunately, based on these concerns neither [Rios] nor [Greene] nor I have confidence in you. You are still welcome to stay in this Office but your assignments will not include civil rights or tort cases. If you do choose to stay here, I will refer you to counseling to deal with what I perceive is a crippling fear of losing.
>
> As I said in the beginning, I would be happy to meet with you, either alone or with [Greene] and [Rios]. Because you told me you were going to look else where for employment, we did not plan to do your formal evaluation. If you decide to stay, we will use this memorandum as the basis of that evaluation. If you decide to stay with this Office, I expect that you will continue to work in a professional manner, putting your resentment aside, working hard for the benefit of our client and making a positive contribution to this Office.

On December 9, 1996, Huskey sent an office-wide e-mail informing his coworkers that he would be leaving the Office by the end of the month. On December 20, 1996, his last day with the Office, Huskey responded to Gallo's memo with a memo defending his job performance.

On August 11, 1997, Huskey filed a complaint in the Superior Court of California for the County of Santa Clara against the City, Gallo, Rios, and Greene. He alleged a federal cause of action arising under 42 U.S.C. § 1983 for violation of his civil rights and supplemental state law claims for wrongful termination in violation of public policy, for violation of his right of privacy, for tortious interference with prospective economic benefit, and for negligence. The City and the individual defendants removed the case to federal court on September 5, 1997. On January 12, 1998, Huskey filed a first amended complaint in which he dropped the negligence claim. Huskey's § 1983 cause of action was based on two theories: (1) he was subjected to retaliation in violation of the First Amendment for informing Gallo of his suspicions about Greene's drinking and (2) he was deprived of his proprietary interest in his position without good cause, notice, or an opportunity to be heard in violation of his Fifth and Fourteenth Amendment right to due process of law.

The City and the individual defendants filed a motion for a summary judgment on November 5, 1998. On January 5, 1999, the district court granted a summary judgment for the defendants with respect to Huskey's invasion of privacy claim. The district court denied the motions for a summary judgment regarding the § 1983 federal claim and the remaining supplemental state law claims. The court held that genuine issues of material facts existed regarding whether the individual defendants were entitled to qualified immunity and whether Huskey's constitutional rights were violated by a policy or custom of the Office. On January 21, 1999, the individual defendants and the City filed a notice of appeal. The district court stayed all further proceedings pending the outcome of this appeal. The merits of Huskey's supplemental state law claims are not before the court in this appeal.

### III

The individual defendants contend that the district court erred in denying their motion for a summary judgment on the basis of qualified immunity. We have jurisdiction over their appeal pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Public officials performing discretionary

functions are shielded from liability in § 1983 actions for civil damages insofar as their conduct does not violate " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). We review de novo a district court's decision to deny a summary judgment on the ground of qualified immunity. *See Moran v. Washington,* 147 F.3d 839, 844 (9th Cir.1998). "When a government official asserts a defense of qualified immunity, the court must first determine whether the plaintiff has alleged facts which, if true, would constitute a deprivation of a constitutional right at all." *See B.C. v. Plumas Unified School Dist.,* 192 F.3d 1260, 1265 (9th Cir.1999) (citing *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999)). Only then should the court proceed to determine whether that right was clearly established at the time of the alleged violation. *See id.* We need not reach the second step of the analysis here because we conclude that Huskey's allegations were insufficient as a matter of law to support his claims of a constitutional violation.

### A

█ In order to sustain his § 1983 claim of retaliation in violation of the First Amendment, Huskey had to demonstrate, as a threshold matter, that he suffered an adverse employment action. *See Nunez v. City of Los Angeles,* 147 F.3d 867, 874–75 (9th Cir.1998). If the facts alleged supported a finding that Huskey suffered an adverse employment action, Huskey then had to demonstrate that (1) the speech at issue was constitutionally protected and (2) that the speech was a substantial motivating factor in the adverse employment action. *See Brewster,* 149 F.3d at 978.

█ We need not decide whether Huskey sufficiently alleged an adverse employment action or whether his speech was constitutionally protected because Huskey failed to introduce evidence demonstrating a nexus between his statements to Gallo and any adverse employment action he may have suffered. Huskey conceded in a deposition that the only reason he believed Greene even knew of his March 1994 statements to Gallo was the fact that Huskey did not know to "what else to attribute the change in the relationship" that happened "six or seven months afterwards." Huskey conceded that he did not know if Gallo had ever acted on Huskey's suspicions or shared them with Greene. Huskey testified that he had not mentioned the incident to Greene and that Greene had never mentioned it to him. Huskey also testified that he did not believe there was any problem between him and Greene at the close of the *Ward* trial. He also stated that the change in his relationship with Greene did not become apparent until six to seven months after Huskey spoke with Gallo. To conclude that Greene was aware of Huskey's statements to Gallo and that Greene retaliated against Huskey because of them would be to engage in the logical fallacy of *post hoc, ergo propter hoc,* literally, "after this, therefore because of this." *See, e.g., Choe v. INS,* 11 F.3d 925, 938 (9th Cir.1993) (Alarcon, J., concurring and dissenting) (discussing *post hoc, ergo propter hoc* ).

Additionally, Huskey introduced evidence that tended to demonstrate he was not subjected to wrongful retaliation after his March 1994 statements to Gallo. Huskey received what he characterized in a declaration as an "excellent" performance evaluation from Greene in late 1994, several months after Huskey told Gallo about his observations of Greene. Finally, with respect to Gallo and Rios, even Huskey expressed bewilderment as to why they would turn against him based on his statements to Gallo about Greene. Huskey did not offer any evidence to support an inference that Huskey's statements to Gallo about Greene were a substantial motivat-

ing factor in Gallo's and Rios's behavior towards Huskey.

Because Huskey failed to introduce any evidence that his protected speech was a substantial motivating factor in any adverse employment action he allegedly experienced, the individual defendants were entitled to a summary judgment on his claim that he was the victim of retaliation for his exercise of his First Amendment rights. *See Nunez,* 147 F.3d at 875 (affirming an order of a summary judgment for the defendant on a wrongful retaliation claim where the plaintiff alleged that he was passed over for promotion but failed to provide "any evidence linking this decision to" the claimant's protected speech activity); *Nelson v. Pima Community College,* 83 F.3d 1075, 1080 (9th Cir. 1996) (affirming an order of a summary judgment for the defendant on a wrongful retaliation claim where the plaintiff submitted evidence that she had engaged in protected speech and that she was subsequently told not to come back to work but did not introduce any evidence of a link between the two events); *Thomas v. Douglas,* 877 F.2d 1428, 1433–34 (9th Cir. 1989) (affirming an order of a summary judgment for the defendant on a wrongful retaliation claim because the claimant failed to offer evidence that his protected speech was a substantial motivating factor in his employer's refusal of his request for a transfer).

### B

In order to sustain his § 1983 due process claim, Huskey had to allege facts from which a reasonable fact finder could conclude that (1) the Office deprived him of a property interest and (2) that it did so without due process of law. *See Brewster,* 149 F.3d at 982. It is undisputed that Huskey had a property interest in his job with the Office. He concedes that he resigned his position with the Office. He nevertheless argues that he was deprived of his property interest in his job because

his resignation was the result of a constructive discharge.

To support his claim of constructive discharge, Huskey was required to demonstrate that there were triable issues of fact as to whether a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions. *See Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1411 (9th Cir.1996). An isolated incident of mistreatment is not enough; Huskey had to show aggravating factors such as a continuing pattern of discriminatory treatment. *See id.* at 1411–12; *King v. AC & R Advertising,* 65 F.3d 764, 767–68 (9th Cir.1995) (stating that, to defeat a summary judgment, the claimant "had to show that the conditions giving rise to his resignation were extraordinary and egregious") (applying California law of constructive discharge). " 'Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury.' " *Schnidrig,* 80 F.3d at 1411 (quoting *Sanchez v. City of Santa Ana,* 915 F.2d 424, 431 (9th Cir. 1990)). Our precedent, however, supports our conclusion that Huskey's allegations were insufficient as a matter of law to sustain a finding by a reasonable fact finder that his "working conditions were [ ] so intolerable and discriminatory that a reasonable person would feel forced to resign." *Id.* at 1412.

In *Schnidrig,* for example, Herman Schnidrig pointed to the following facts to support his claim that he had been constructively discharged: "(1) He was replaced as head of the company by a man fifteen years younger than him; (2) [The company] did not give him a new position; (3) Another vice-president was given a pay raise so that he was earning more than Schnidrig; (4) He was forced to move out of his office and into a much smaller office; (5) He was excluded from a lunch meeting with officers from [the company's bank]; and (6) Other executives were told not to

speak with him about financial or other matters." *Id.* at 1411. We affirmed the grant of a summary judgment to the defendant on Schnidrig's claim of constructive discharge because "[a]ccepting all of Schnidrig's allegations as true, his working conditions were not so intolerable and discriminatory that a reasonable person would feel forced to resign." *Id.* at 1412. In support of that conclusion, we noted that "Schnidrig was not demoted, did not receive a cut in pay, was not encouraged to resign or retire, and was not disciplined." *Id.*

In *Steiner v. Showboat Operating Co.,* 25 F.3d 1459 (9th Cir.1994), the plaintiff, a blackjack dealer at a casino, claimed she had been constructively discharged. *Id.* at 1465–66. She alleged that, at the time she resigned, Showboat was laying the groundwork for her termination or was attempting to force her to quit. *See id.* at 1466. In support of her allegation, she pointed to an employee evaluation she had received from casino management in which she received three "Below Standard" marks out of seven categories, primarily because of her alleged inability to supervise any game except blackjack. *See id.* at 1462. She also pointed to an incident in which a supervisor ordered her to oversee a complicated game of roulette, which he knew she was incapable of doing. *See id.* When she was unable to calculate the payoffs, she contended, the supervisor publicly ridiculed her. *See id.* We held that these allegations were insufficient to sustain a claim of constructive discharge because Steiner failed to establish that either the evaluation or the incident with her supervisor was discriminatory or retaliatory or that either constituted "the kind of 'intolerable' act that would force an employee to resign." *Id.* at 1466.

In *King,* Patrick King, an advertising executive, alleged he had been constructively discharged because (1) upon expiration of King's employment contract, the employer stated that he would not draw up a new one and that King was to be an at-will employee; (2) King's managerial responsibilities were reduced; and (3) King's compensation package was restructured against his wishes so that his salary decreased from $235,000 to $175,000 and his bonus changed from a fixed amount to a performance-based amount. *King,* 65 F.3d at 767–68. We concluded that King's allegations were insufficient to support a finding that his "working conditions [were] so unusually adverse that a reasonable employee in [his] position would have felt compelled to resign." *Id.* at 769 (quotations omitted). We held that King was not constructively discharged. *See id.*

█ The record shows that Huskey was not demoted or disciplined, nor did he receive a cut in pay. Although Gallo once responded affirmatively when Huskey asked her if he should leave the Office, she explicitly stated in the December 3, 1996, memo to Huskey that he was "welcome to stay in this Office." Huskey alleges that he was told he would be "referred to counseling," was assigned cases that he viewed as beneath him, was criticized, and was given the "cold shoulder" by his colleagues. We are persuaded that the individual defendants' conduct was neither qualitatively nor quantitatively more intolerable or discriminatory than the allegations in *Schnidrig, Steiner,* and *King.*

In support of his claim of constructive discharge, Huskey also asserts that he was forced to resign because Gallo's criticism of his "crippling fear of losing" created a conflict of interest in that he would feel compelled to take all his cases to trial in order to combat her perception even when proceeding to trial was not in the best interest of his client, the City of San Jose. We conclude that this alleged ethical dilemma is also insufficient to sustain a finding that Huskey was constructively discharged.

In *Thomas,* 877 F.2d at 1434, we affirmed an order of a summary judgment for the defendant sheriff and county on a police officer's constructive discharge claim. Officer Danny Thomas was a

"whistle-blower" who had reported his suspicions of misconduct by two of his fellow officers to the Internal Affairs office. *See id.* at 1430. As the investigation into the named officers went forward, rumors circulated that Thomas was one of the informers. *See id.* at 1432. Thomas came to fear retaliation from other officers and resigned. *See id.* at 1430. We concluded that there was insufficient evidence of "aggravating factors or differential, discriminatory or retaliatory treatment" to support Thomas's claim of constructive discharge, noting that

> Thomas was not required to perform any unusually dangerous or onerous duties, and he was not subjected to any harassment or violent acts or any other treatment which could be considered punishment or retaliation.... *It was not unreasonable for Thomas to feel uncomfortable in his situation. His subjective personal discomfort, however, was most likely not the product of any action by appellees but, rather, the product of human nature.*

*Id.* at 1434 (emphasis added).

Huskey's ethical dilemma was similarly of his own making. He did not allege that he was told by Gallo or anyone else that he had to go to trial in all of his cases. In fact, in the same December 3, 1996, memo in which Gallo criticized Huskey's "crippling fear of losing," Gallo expressed a continuing expectation that Huskey would work in the client's best interests, stating "[i]f you decide to stay with this Office, I expect that you will continue to work in a professional manner, putting your resentment aside, working hard for the benefit of our client and making a positive contribution to this Office." The fact that Huskey was concerned his future decisions not to take particular cases to trial might be scrutinized is not enough to support the conclusion that he was constructively discharged. *See Thomas,* 877 F.2d at 1434.

Because he failed to allege facts sufficient to support a finding of constructive discharge, Huskey also failed to allege facts sufficient to support a finding that he was deprived of a property interest. The district court therefore erred in denying the individual defendants' motion for a summary judgment as to Huskey's § 1983 claim of a due process violation. *See B.C.,* 192 F.3d at 1265 (noting that the first step in evaluating a defense of qualified immunity is to determine whether the plaintiff has alleged facts that, if true, would constitute a deprivation of a constitutional right).

## IV

The City has requested that we consider the merits of its appeal from the denial of its motion for a summary judgment as pendent to the individual defendants' interlocutory appeal. A municipality is not entitled to assert the defense of qualified immunity. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Thus the rule announced in *Mitchell v. Forsyth* that individual defendants can appeal from the denial of a motion for a summary judgment to obtain review of the merits of their qualified immunity defense does not empower a federal court to consider the denial of a municipality's motion for a summary judgment in a § 1983 action. *See Swint v. Chambers County Com'n,* 514 U.S. 35, 38, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). The City argues that, if this court concludes that Gallo's conduct did not violate Huskey's federal constitutional rights, this court has pendent appellate jurisdiction over the merits of the City's contention that the evidence is legally insufficient to support a judgment against it on Huskey's § 1983 claim.

We begin our analysis of the City's contention with a discussion of the current state of the law regarding pendent appellate jurisdiction. In 1995, the Supreme Court held that the Eleventh Circuit had improperly invoked the doctrine of pendent appellate jurisdiction. *See Swint,* 514 U.S. at 51, 115 S.Ct. 1203. In *Swint,* the plaintiffs filed a § 1983 action against three police officers and the Chambers

County Commission. *Id.* at 37, 115 S.Ct. 1203. The three officers asserted the defense of qualified immunity. *See id.* at 38, 115 S.Ct. 1203. The Chambers County Commission contended that it was not liable because the sheriff who authorized the alleged civil rights violations was not a policymaker for the Chambers County Commission. *See id.* at 39, 115 S.Ct. 1203. The district court concluded that neither the officers nor the Chambers County Commission were entitled to a summary judgment on the plaintiffs' § 1983 claims. *See id.* Both parties appealed. *See id.* at 40.

The Eleventh Circuit held that it had jurisdiction over the officers' appeal under *Mitchell v. Forsyth. See id.* With respect to the individual officers' appeal, the Court of Appeals reversed the denial of a summary judgment on the plaintiffs' due process claims based on the defense of qualified immunity, but affirmed the denial of a summary judgment as to plaintiffs' § 1983 Fourth Amendment and equal protection claims. *See Swint v. City of Wadley,* 5 F.3d 1435, 1448 (11th Cir.1993), *vacated in part,* 514 U.S. 35, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). The Eleventh Circuit also held that it had pendent appellate jurisdiction over the Chambers County Commission's appeal. *See Swint,* 514 U.S. at 40, 115 S.Ct. 1203. The Eleventh Circuit reversed the denial of a summary judgment to the Chambers County Commission on all of the plaintiffs' § 1983 claims after concluding that the Sheriff was not a policymaker. *See Swint,* 5 F.3d at 1451.

The Supreme Court granted certiorari to review the Eleventh Circuit's decision that the Chambers County Commission was entitled to a summary judgment because the Sheriff was not its agent or a policymaker for Chambers County. *See Swint,* 514 U.S. at 37, 115 S.Ct. 1203. The Court ultimately did not reach that issue. *See id.* at 37–38, 115 S.Ct. 1203. The Court agreed that the Court of Appeals had jurisdiction over the individual offi-

cers' appeal but held that it "did not thereby gain authority to review the denial of the Chambers County Commission's motion for summary judgment." *Id.* at 38, 115 S.Ct. 1203. The Court found that the Eleventh Circuit's exercise of pendent appellate jurisdiction was improper under the facts presented in *Swint,* reasoning that

> [w]e need not definitively or preemptively settle here whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently appealable. The parties do not contend that the District Court's decision to deny the Chambers County Commission's summary judgment motion was inextricably intertwined with that court's decision to deny the individual defendants' qualified immunity motions, or that review of the former decision was necessary to ensure meaningful review of the latter. Nor could the parties so argue. The individual defendants' qualified immunity turns on whether they violated clearly established federal law; the county commission's liability turns on the allocation of law enforcement power in Alabama.

*Id.* at 50–51, 115 S.Ct. 1203 (citations omitted).

We first applied the holding of *Swint* in *Henderson v. Mohave County,* 54 F.3d 592 (9th Cir.1995). In *Henderson,* the plaintiff sued several law enforcement officers and Mohave County under 42 U.S.C. § 1983 for violation of her constitutional rights. *Id.* at 594. The County and the officers moved for a summary judgment on the ground that no constitutional violation was established on the facts alleged. *See id.* The district court denied the motion. *See id.* The individual officers and the County filed an interlocutory appeal. *See id.* We summarily dismissed the County's appeal for lack of jurisdiction in the following words: "The district court's denial of summary judgment against the county does not qualify as a 'collateral order,' and there

is no 'pendent appellate jurisdiction' over the county's claim. Consequently, the appeal of the County must be dismissed for lack of jurisdiction." *Id.* (citation omitted) (quoting *Swint,* 514 U.S. at 38, 115 S.Ct. 1203).

We did not consider in *Henderson* whether the district court's decision to deny Mohave County's motion for a summary judgment was inextricably intertwined with its decision to deny the individual officers' motions for a summary judgment based on the defense of qualified immunity. After reviewing the record, we concluded in *Henderson* that the district court did not err in denying the officers' motion for a summary judgment. *Id.* at 595. The effect of our decision in *Henderson* was to remand the matter to the district court for a trial on the merits of the plaintiff's claim of a constitutional violation by the individual officers and the County of Mohave. The instant case is distinguishable from *Henderson* because, taking all of Huskey's allegations as true, he did not suffer a federal constitutional violation.

▇▇▇▇ A "deprivation of ... rights, privileges, or immunities secured by the Constitution and laws" of the United States is a prerequisite for both individual and municipal § 1983 liability. 42 U.S.C. § 1983. An individual local government officer may be liable under § 1983 only if (1) the plaintiff suffered a deprivation of rights secured to him by the constitution and laws of the United States and (2) the officer responsible for the deprivation is not entitled to qualified immunity because the right violated was clearly established at the time of the violation. *See Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1696–97, 143 L.Ed.2d 818 (1999) (noting that the first step in evaluating a qualified immunity defense to a § 1983 claim is to "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all"). A municipality may be liable under § 1983 only if (1) the plaintiff suffered a deprivation of rights secured to him by

the constitution and laws of the United States and (2) the violation occurred pursuant to an official policy or custom. *See Owen,* 445 U.S. at 657–58, 100 S.Ct. 1398 (holding that a municipality may not assert the defense of qualified immunity but may be held liable under § 1983 only for a constitutional deprivation "inflicted by the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy' ") (quoting *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

Huskey's theory of the City's § 1983 liability rests solely on Gallo's allegedly unconstitutional actions and his contention that those actions are attributable to the City because Gallo was a policymaker for the Office. In his brief to this court, Huskey refers us to his opposition to the City's summary judgment motion to support his argument that we should not exercise pendent appellate jurisdiction over the City's appeal. There, he argued that Gallo, as a policymaker for the Office, "chose a course of action which resulted in a deprivation of plaintiff's constitutional rights" and that Gallo's "dealings with plaintiff and the choices that she made [ ] cost him his job, without a hearing." Because Huskey failed to demonstrate that Gallo's actions deprived him of rights secured to him by the constitution and laws of the United States, we need not reach the question whether Gallo's actions represented official policy of the City. Our conclusion that Gallo and the other individual defendants were entitled to qualified immunity because Huskey failed to allege a constitutional deprivation necessarily forecloses the possibility of the City's § 1983 liability for Gallo's actions.

Based on the foregoing analysis, we conclude that this is a proper case for the exercise of pendent party appellate jurisdiction. We have recognized that pendent party appellate jurisdiction may be permissible under the "inextricably intertwined"

exception suggested by the Supreme Court in *Swint.* *See Watkins v. City of Oakland,* 145 F.3d 1087, 1092 (9th Cir.1998) (declining to exercise pendent appellate jurisdiction over City's appeal after determining that the City's § 1983 liability was not inextricably intertwined with the individual defendants' claim of qualified immunity). We hold that the "inextricably intertwined" exception suggested in *Swint* applies to the City's appeal in this case. The Sixth and Tenth Circuits have both come to the same conclusion when presented with facts similar to those presented in the instant matter. *See Mattox v. City of Forest Park,* 183 F.3d 515, 523–24 (6th Cir.1999); *Moore v. City of Wynnewood,* 57 F.3d 924, 929–31 (10th Cir.1995). We are persuaded by their reasoning.

In *Moore,* the plaintiff, a former deputy chief of police, filed a § 1983 against the Chief of Police for the City of Wynnewood and the City of Wynnewood in which he alleged that he was demoted because he exercised his First Amendment rights at a city council meeting. *Id.* at 926–27. The plaintiff also filed pendent state law claims. *See id.* at 927. The Chief of Police and the City of Wynnewood moved for a summary judgment. The district court denied the motions except for a state law tort claim against the Chief of Police. *See id.* The Chief of Police and the City of Wynnewood filed an interlocutory appeal from the denial of their motions for a summary judgment. *See id.*

The Tenth Circuit reversed the judgment of the district court, holding that the plaintiff had failed to show that the Chief of Police deprived him of his First Amendment rights. *See id.* The Court of Appeals also concluded that it could consider the City of Wynnewood's interlocutory appeal under the doctrine of pendent appellate jurisdiction because the disposition of the appeal of the Chief of Police "fully resolves the issues presented in the City's appeal." *Id.* at 929. The Tenth Circuit reasoned as follows:

In the instant case, we conclude that the City's appeal is "inextricably intertwined" with [the Chief of Police's] appeal and, thus, falls into one of the narrow exceptions left open by *Swint.* As we read *Swint,* a pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well. Here, we conclude that the two appeals are coterminous because Moore's federal and state law claims against the City—to the extent the state law claim references the alleged constitutional violation—are both premised on his claim that Defendants violated his First Amendment rights *and* because we hold that no such First Amendment violation occurred. As such, the issues presented in the City's appeal are no broader than those in [the Chief of Police's] permissible collateral appeal, and our disposition of [the Chief of Police's] appeal fully disposes of his claims against the City.

This narrow avenue for the continued use of pendent appellate jurisdiction left open by *Swint* would not apply to the instant case if our ruling on the merits of the collateral qualified immunity appeal did not resolve all of the remaining issues presented by the pendent appeal. As the *Swint* Court itself pointed out, a municipality's appeal of a § 1983 claim is not necessarily inextricably intertwined with an appeal of the denial of qualified immunity, and need not be resolved to ensure full review of the qualified immunity appeal. For example, were we to hold that Moore's First Amendment rights were violated, the City's liability might turn on whether [the Chief of Police], or the city manager who ratified [his] decision to demote Moore, were "final policymakers" for § 1983 purposes. Similarly, the City's appeal

might present different issues than [the Chief of Police's] appeal if we concluded that Defendants violated Moore's First Amendment rights, but [the Chief of Police] was protected by qualified immunity because those rights were not clearly established.

*Id.* at 930 (citations omitted).

In *Mattox,* two women filed a § 1983 action against the City of Forest Park, the police chief, the city manager, and a police officer alleging, among other claims, retaliation in violation of the First Amendment. *Mattox,* 183 F.3d at 517. The individual defendants moved for a summary judgment on the basis of qualified immunity and the City of Forest Park moved for a summary judgment on the ground that the claimants' allegations were insufficient to support a finding of a constitutional violation. *See id.* at 518. The district court denied the motion with respect to the plaintiffs' First Amendment claims. *See id.* The individual defendants and the City of Forest Park filed an interlocutory appeal. *See id.*

On appeal, the Sixth Circuit concluded that the district erred in denying the individual defendants' motion for a summary judgment on the basis of qualified immunity because "neither plaintiff ... ha[d] alleged an 'adverse action' sufficient to sustain a claim of First Amendment retaliation." *Id.* at 523. The court then turned to the denial of the City's motion for a summary judgment. *See id.* The court in *Mattox* concluded that its decision that no First Amendment violation had been alleged necessarily resolved the issue of the City's § 1983 liability and that pendent appellate jurisdiction was therefore proper. *See id.* at 523–24. The Court of Appeals distinguished the Supreme Court's holding in *Swint* as follows:

If the plaintiffs have failed to state a claim for violation of a constitutional right at all, then the City of Forest Park

cannot be held liable for violating that right any more than the individual defendants can. The inquiry is precisely the same in both cases, and the justification for the decision in *Swint* is not present here.

*Id.* at 523. The reasoning of the Tenth and Sixth Circuits in *Moore* and *Mattox,* respectively, applies with equal force to the instant case.

That the liability of the City of San Jose is inextricably intertwined with the conduct of its City Attorney under Huskey's theory of the case can be demonstrated by the following syllogism:

The City would be liable to Huskey for the deprivation of his federal constitutional rights resulting from a policy or custom adopted by Gallo in her role as a city policymaker.

Huskey has failed to present legally sufficient evidence that any custom or policy adopted by Gallo deprived him of his federal constitutional rights.

Therefore, the City is not liable to Huskey under § 1983.

## CONCLUSION

Because Huskey's allegations were insufficient to sustain a finding of a constitutional deprivation, the district court erred in denying the motions of the individual defendants and the City for a summary judgment on Huskey's § 1983 claims.[2] The order denying the individual defendants' and the City's motion for a summary judgment on Huskey's § 1983 claims is VACATED. The district court is directed to enter an order dismissing Huskey's § 1983 claims against the individual defendants and the City.

Each party shall bear its own costs.

---

**2.** We express no view regarding the merits of Huskey's pending supplemental state law    claims.