201 P.3d 640

**Joe C. WATERMAN, Plaintiff–Appellant,**

**v.**

**NATIONWIDE MUTUAL INSURANCE COMPANY and Allied Insurance Company, Defendants–Respondents.**

**No. 33883.**

Supreme Court of Idaho,
Boise, December 2008 Term.

Jan. 22, 2009.

Kirkendall Law Office and Law Offices of Peter Desler, PC, Boise, for appellant. Peter Desler argued.

Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, for respondent. Patricia M. Olsson argued.

W. JONES, Justice.

## NATURE OF CASE

Joe Waterman (Appellant) brought an action against his former employer, Nationwide Mutual Insurance Company and Allied Insurance Company (collectively Respondent). Although Appellant initially filed several causes of action, the case proceeded to trial only on Respondent's alleged violation of the Age Discrimination in Employment Act of 1967 (ADEA). After the jury returned a verdict in favor of Appellant, awarding him $700,000.00 in damages, the district court granted Respondent's motion for directed verdict. Appellant brings this appeal requesting this Court to reverse the district court's directed verdict ruling and to reinstate the jury verdict in his favor.

## FACTUAL AND PROCEDURAL BACKGROUND

Nationwide hired Appellant in 1979 as an insurance claims adjustor and gave him "pretty intense" training during his first six months on the job. Appellant was the sole Nationwide adjustor in the Boise area until approximately 1993, at which time the number of claims in the Boise area increased and Nationwide hired a second adjustor. Until that time, Appellant handled multiline claims, including homeowner, auto, property damage, and bodily injury and liability investigations. After the second adjustor was hired, Appellant's responsibility was limited to property damage claims. In 2000, the second adjustor left the Boise office, but Appellant continued to handle property damage claims exclusively until 2001, which is when the alleged adverse employment actions commenced.

Nationwide purchased Allied Group Inc. in October 1998. The two companies began integrating in 2000. Prior to the merger, Nationwide used the Class software system to handle claims and Allied used the Passport software system. Mike Lex (Mr. Lex), Allied's Regional Vice–President, testified that he was in charge of transitioning the companies to one common claims handling software system. He testified that the company chose to convert all claims handling processes to the Allied Passport model to achieve the goal of a lower loss expense ratio.

Mr. Lex also testified he was part of the team that determined which adjustors would be retained after the merger. To accomplish this task, all employees were required to fill out a Technical Background Update explaining their technical competency and prior performance. In July of 2000, Appellant filled out a Technical Background Update wherein he listed 21.5 years experience in auto and property damage claims and 15 years experience in med pay, bodily injury, litigation, general liability and personal injury protection.

From June through October 2000, Appellant received a weekly company publication entitled "Up to Date: An Integration Update for Nationwide's Western States Claims Associates," which answered in-depth questions about the merger. Appellant first learned in early October of 2000 that he would have a position with the company after the merger as a multiline adjustor. Appellant testified that his supervisor never physically handed him a job description, but he also admitted that such materials were available online for review.

Prior to the merger, Appellant worked out of an office, but in December 2000, he was required to move his office into his house. Appellant was expected to settle the Nationwide claims that existed prior to the merger on the Nationwide software system while simultaneously transitioning to the new Allied software system. This required Appellant to set up two separate computers in his home office because the Allied and Nationwide software systems could not run on the same computer. DSL[1] was not available at Appellant's home office at that time, so he had to use a dial-up line and completely shut down one computer and boot up the other computer any time that he needed to change between the two software systems. Appellant mentioned that the company gave another adjustor a switch that allowed her to go quickly and easily from one program to another. Appellant requested such a switch but was denied. Appellant testified that the company indicated "it's only a matter of time before you are done with the pending claims on Class and it's not within our affordability to do that."

The parties dispute when Appellant began processing Allied claims. Appellant argues it was on January 1, 2001; Respondent claims it was not until February 2001. Either way, Appellant testified that the increased number of claims overwhelmed him and his requests for help went unanswered. However, Respondent put on evidence that Appellant was not meeting the company's expectations for workload or timeliness. On February 4,

2001, Appellant was given a verbal warning for failure to comply with claims handling criteria. In March 2001, Respondent attempted to help Appellant by creating an action plan to improve his performance.

Appellant argues that he did not receive proper training on the Allied Passport system. He testified that he attended two meetings in Denver, his boss visited him once in Boise, and he spent a few days job shadowing an adjustor in Colorado. Appellant stated that Respondent failed in each situation to provide him even the most basic training that would be required for him to perform the job adequately. However, on May 2, 2001, during a conference call between Appellant and his supervisors that was set up to discuss Appellant's performance issues, Appellant indicated to Nita Dunn, Respondent's human resources consultant, that a lack of training was not the reason for his poor performance:

> Dunn: And it is not because, if I understand you correctly it is not because you feel that uh you haven't received enough training or that you don't have the proper tools to do your job. But simply that the workload is too heavy.
>
> Waterman: Correct.

On May 22, 2001, Appellant agreed to a work improvement plan that called for Appellant to become compliant with Respondent's claims handling standards by 50% within one month and 75% within three months. Around this time Appellant requested a severance package from Respondent, which Respondent denied, stating "your request for consideration of a severance option was unusual, as your position with Allied has not been eliminated."

From June 4, 2001 through June 14, 2001, Appellant went on a preplanned vacation. Immediately following his vacation, Appellant took leave under the Family and Medical Leave Act (FMLA) due to depression and his doctor's advice not to work for four to six months. Appellant received a letter dated September 5, 2001 stating that his FMLA leave was exhausted and "based on business

---

1. "DSL" is shorthand for "digital subscriber line," which is a speedy medium for transferring data over regular phone lines and can be used to connect to the Internet. *See* The Tech Terms Computer Dictionary, http://www.techterms.com/definition/dsl (last visited Dec. 5, 2008).

needs, a decision has been made to restaff your position. This decision does not reflect on your ability to do your job, but rather the company's need to ensure the job gets done despite your absence." On September 6, 2001, Respondent posted a position for a Boise area claims adjustor. On September 17, 2001, Appellant was specifically told that his position had not yet been restaffed and that he should try a gradual return to work, but he refused, stating he did not believe he could ever return to a normal workload. On September 24, 2001, Respondent filled the position with Tamyra Gent, age 41.

As of the date Appellant's FMLA leave expired, Respondent placed him on long-term disability and he received approximately 60% of his salary. Appellant was subsequently found not to be disabled after an independent medical examination was conducted. On April 27, 2002, Respondent reinstated Appellant's full salary for two months and advised Appellant to search for a new job within the company, but there were no positions available in Boise and Appellant was not willing to relocate. Appellant was 51 years old as of his last day of employment with Respondent.

On July 24, 2004, Appellant filed a Complaint and Demand for Jury Trial against Respondent asserting various causes of action that primarily focused on age discrimination. Respondent filed an Answer, essentially denying the allegations made by Appellant and raising the following affirmative defenses, among others: defendant's actions were taken for legitimate, non-discriminatory reasons and without regard to plaintiff's age, plaintiff failed to take advantage of preventative or corrective opportunities provided by defendant or to otherwise avoid harm, and defendant acted in good faith in applying policies of which plaintiff was aware when he was hired and during his employment. The jury trial commenced on December 13, 2006, and lasted four days.

During trial, Appellant presented testimony by a claims director that he was aware of "some statements made in group meetings where Allied was referred to as a young company." However, the claims director did not know what the statements meant. Appellant also presented testimony of a district claims manager that, in reference to a conversation with his supervisor about a job applicant who was in his sixties, his supervisor stated to him, "Well, you know, Allied is a young company." The inference was that the job applicant was too old for the position, but he was ultimately hired.

After Appellant rested his case, Respondent moved for directed verdict, alleging Appellant failed to establish a *prima facie* case of age discrimination because a reasonable person could not find the second, third, or fourth elements of an ADEA claim. The district court denied Respondent's motion for directed verdict, but noted that Respondent could renew its motion at the end of trial. Respondent then presented its defense case.

On December 20, 2006, both sides rested and Respondent renewed its motion for directed verdict. The court took it under advisement. The jury returned a 9–3 verdict in favor of Appellant and awarded $700,000.00 in damages. After the district court dismissed the jury, Respondent again renewed its motion for directed verdict. The court granted the motion, stating, "I've considered this carefully. I fully expected the jury to take me off the hook on this, but they have not. I'm satisfied that the plaintiff has failed to establish the requisite elements and that a properly deliberative jury could not have reached the verdict that they did." On December 21, 2006, the court issued its written Ruling on Motion for Directed Verdict. On December 27, 2006, the court entered judgment against Appellant and in favor of Respondent. There is no evidence in the record that either party requested or received attorney fees below. Appellant brought this appeal seeking reinstatement of the jury verdict in the amount of $700,000.00, plus interest. Respondent requests attorney fees on appeal.

## ISSUES ON APPEAL

1. Did the district court err in granting Respondent's motion for directed verdict? [2]

---

**2.** After the jury returned the verdict, Respondent should have moved for judgment notwithstand-

ing the verdict rather than renew its motion for directed verdict. *See* I.R.C.P. § 50. However,

2. Is Respondent entitled to attorney fees on appeal?

## STANDARD OF REVIEW

■ In reviewing a decision to grant or deny a motion for directed verdict or a judgment notwithstanding the verdict, this Court applies the same standard as that applied by the trial court when originally ruling on the motion. *Gunter v. Murphy's Lounge, LLC,* 141 Idaho 16, 27, 105 P.3d 676, 687 (2005) (citation omitted). This Court conducts an independent review of the evidence and does not defer to the trial court's findings. *Id.* This Court must determine whether, admitting the truth of the adverse evidence and drawing every legitimate inference most favorably to the opposing party, there exists substantial evidence to justify submitting the case to the jury. *Id.* The substantial evidence test does not require the evidence be uncontradicted. *Id.* It requires only that the evidence be of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper. *Id.*

■ Federal law guides this Court in its interpretation of ADEA claims. *See O'Dell v. Basabe,* 119 Idaho 796, 811, 810 P.2d 1082, 1097 (1991) (citations omitted). Different jurisdictions, both within and outside the state of Idaho, recite the elements of an ADEA claim differently. To establish an age discrimination claim for the purposes of this case, Appellant must first demonstrate that he was a member of a protected class, which here is an employee at least 40 years of age. 29 U.S.C. § 631(a); *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 891 (9th Cir.1994). Second, he must demonstrate that he was performing his job in a satisfactory manner. *Peterson v. Hewlett–Packard Co.,* 358 F.3d 599, 603 (9th Cir.2004); *Wallis,* 26 F.3d at 891. Third, he must demonstrate that he was discharged or his employer took adverse employment action against him. *Id.* Fourth, he must demonstrate that his position was filled by a younger person of equal or lesser qualifications. *Wallis,* 26 F.3d at 891. In this case,

the two motions are reviewed under the same standard and for the purposes of this case any

the third element of Appellant's ADEA claim is dispositive, so we need not address elements one, two, or four.

## ANALYSIS

**The district court did not err in granting Respondent's motion for directed verdict.**

■ To establish the third element of Appellant's ADEA claim, he must prove he was discharged or Respondent took adverse employment action against him. In this case, Appellant contends he was constructively discharged. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Poland v. Chertoff,* 494 F.3d 1174, 1184 (9th Cir.2007) (*quoting Penn. State Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 2351, 159 L.Ed.2d 204, 216 (2004)). Under the adverse employment action doctrine, the United States Supreme Court has stated, "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633, 652–53 (1998) (*comparing Crady v. Liberty Nat. Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir.1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), with *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994) (a "bruised ego" is not enough), *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 887 (6th Cir.1996) (demotion without change in pay, benefits, duties, or pres-

distinction between the motions is without a difference.

tige insufficient), and *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient)).

When a plaintiff alleges disparate treatment by an employer in an ADEA case, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000) (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338, 346 (1993)). Whatever the employer's decision-making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome. *Id.* Stray remarks are insufficient to establish discrimination. *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (*citing Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990)). To establish the nexus between Respondent's allegedly discriminatory motive and the third element of Appellant's ADEA claim, Appellant cites to two stray comments that Nationwide–Allied was a "young company." Appellant failed to put these comments into context and did not produce evidence of the intent behind the comments, thus the stray comments are insufficient to establish a discriminatory intent.

Furthermore, there is no substantial evidence in the record that Appellant was constructively discharged or that Respondent took adverse employment action against him. Appellant presented evidence at trial that he was not happy with his new position after the merger and his responsibilities changed in a way he found unpleasant. However, he failed to establish a nexus between the alleged adverse employment actions of which he complains and any iota of evidence that age discrimination was a motivating factor. Appellant claims he satisfied this element of his ADEA claim by producing evidence at trial that he did not receive adequate training, he had insufficient knowledge of the merger, he was assigned an overwhelming number of claims, he performed the work of a two adjustor job, he was forced to use two computers, and he had to work in intolerable conditions. However, Respondent presented evidence that Appellant specifically denied training was an issue, he was not trained differently than other employees, his claim load was within normal limits, there is no evidence that Appellant did the work of two adjustors, the computer set-up in Appellant's home was nothing more than a temporary annoyance, and Appellant was on notice of the merger as early as February 2000 and kept advised of the merger by weekly updates. Moreover, Respondent attempted to work with Appellant so he could gradually return to his job, offered to help him find another position within the company after he complained about his new position, and made a good faith offer for him to participate in the company's rehiring process after his benefits were set to expire.

Appellant essentially requests this Court to overturn the district court's entry of directed verdict based on conjecture and speculation that two stray comments provide sufficient evidence of discriminatory animus on the part of Respondent. We decline to do so. Accordingly, we affirm the district court's entry of directed verdict against Appellant.

**Respondent is not entitled to attorney fees on appeal.**

Respondent requests attorney fees on appeal pursuant to IC § 12–121. Attorney fees can be awarded on appeal under IC § 12–121 only if the appeal was brought or defended frivolously, unreasonably, or without foundation. *Teton Peaks Inv. Co., LLC v. Ohme*, 146 Idaho 394, 399, 195 P.3d 1207, 1212 (2008). We cannot say Appellant frivolously brought this appeal where the jury found in favor of Appellant, awarded $700,000.00 in damages, and the district court thereafter entered directed verdict against Appellant. Thus, we deny Respondent's request for attorney fees on appeal.

## CONCLUSION

After drawing every legitimate inference in favor of Appellant, we find Appellant did not produce substantial evidence to establish the third element of this ADEA claim.

Therefore, we affirm the district court's decision to grant Respondent's motion for directed verdict. We deny Respondent's request for attorney fees on appeal. Costs to Respondent.

Justices BURDICK, J. JONES, HORTON and Justice pro tem WALTERS, concur.