**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 39507**

| | | |
|---|---|---|
| LILLIAN HATHEWAY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | **Lewiston, April 2013 Term** |
| | ) | |
| v. | ) | **2013 Opinion No. 99** |
| | ) | |
| BOARD OF REGENTS OF THE | ) | **Filed: September 6, 2013** |
| UNIVERSITY OF IDAHO, and | ) | |
| UNIVERSITY OF IDAHO, | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| Defendants-Respondents. | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Latah County. Hon. Jeff M. Brudie, District Judge

The judgment of the district court is affirmed.

Winston & Cashatt Lawyers, PS, Coeur d'Alene, for appellant. Scott Atkinson Gingras argued.

Paine Hamblen, LLP, Coeur d'Alene, for respondents. Peter C. Erbland argued.

_____

BURDICK, Chief Justice

Appellant, Lillian Hatheway, appeals the Latah County district court's dismissal on summary judgment of all of her claims against Respondents, the Board of Regents of the University of Idaho and the University of Idaho (collectively "the University"). Hatheway worked at the University as an administrative assistant from 1999 until 2008 when she resigned. On October 22, 2008, she sued the University for age discrimination, hostile work environment, retaliation, constructive discharge, and negligent infliction of emotional distress.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Hatheway began working for the University of Idaho in 1999. She held the position of Administrative Assistant II in the associate dean's office. In September 2002, Hatheway transferred to the English Department where she continued to hold the same position and title.

Dr. David Barber was her supervisor until July 2005 when Dr. Kurt Olsson was appointed chair of the English Department. Around September 2005, the position of financial technician within the English Department became vacant, and a search committee was formed that included Hatheway. The committee unanimously agreed that the best applicant for the position was Deborah Allen. Allen, who had a bachelor's degree and the qualifications critical to the position's needs, was already a University employee and was earning a higher wage than was contemplated for the position. Allen accepted the position after Dr. Olsson was able to negotiate a wage that was competitive with the wage she had been earning, although it was still less than her previous wage.

Shortly after Allen was hired in the English Department, Hatheway expressed her discontent with the fact that Allen was paid a higher hourly wage than her despite Allen having less "Hay Points"[1] than Hatheway. Dr. Olsson explained that Allen's wage "was a function of her previous salary, market forces, and our needs." In her deposition, Hatheway admitted that the problem started for her when Allen was hired and paid a wage higher than her own. Further, she stated that she would have been satisfied and felt the issue had been resolved if she had been reimbursed at an equal pay rate as Allen. At the end of 2005, Dr. Olsson completed Hatheway's performance evaluation for the year and ranked her as exceeding expectations in all categories.

Hatheway claims that her work environment became negative and hostile after the President of the University, Timothy White, gave his State of the University Address on May 1, 2006. In one part of his speech, President White appears to urge older employees to retire when they become less productive. In relevant part, President White stated:

> And finally on the whole compensation issue, we share a responsibility to recruit faculty and staff here and to retain them. I want to add the third "R" in that now. We also have a responsibility to retire. And when we get to that point in life where we're not as productive, where it'll help the university and our programs that we care so deeply about, recruit a young entry-level or mid-career person. It is time to get out of the way. Now there are legitimate reasons why people can't retire. They're my age and they've got a two year old at home, so they need a job. Maybe it's a health insurance issue and they don't quite yet qualify for health insurance. We have to look at the barriers that are getting in the way for those

---

[1] In her brief, Hatheway described the "Hay Point factor analysis" as "a method of job measurement used to establish the relative significance of jobs as they fit within an organization." She goes on to state that "her job at the University required knowledge of and how to interpret University policies and procedures" and that "Hay points means that your job is considered a little more difficult and is a scale for the University to determine pay." In Dr. Olsson's written response to Hatheway's complaints, he states that "Hay points only allow the institution to place a position in a given pay grade; they are not designed or intended to address equity issues within a grade."

who may want to go to a part-time appointment or to fully retire. […]I am supportive of a concept where we could somehow bridge, on a part-time basis. Take care of some of these unusual costs for a limited time, to let people say, "You know, I can do this now. I can get out of the way." Let us commit those resources to some other permanent hire. It's a very important thing that we have to get into our conversations.

On March 23, 2007, Hatheway received her second performance evaluation from Dr. Olsson, which rated her as "needing improvement" in six categories with detailed comments explaining the negative ratings. Hatheway was also provided with a Professional Development Plan ("PDP") designed to improve her performance in the coming year. Hatheway was unhappy with her performance evaluation and met with Dr. Olsson to discuss it the following day. Hatheway claims that Dr. Olsson could not give any specific instances related to her performance issues stated in the evaluation.[2] In contrast, Dr. Olsson asserts that the reason for Hatheway's more negative performance evaluation was because of her continued unprofessional conduct of voicing her complaints and dislike of Allen and Dr. Olsson to others within the Department. Allen had reported her unpleasant encounters to Dr. Olsson and had brought her concerns to the University's Human Resources Department. Indeed, Allen submitted her resignation in January 2007 before Dr. Olsson had completed Hatheway's performance evaluation for 2006. Dr. Olsson claims that Allen cited increasingly unpleasant encounters with Hatheway as the reason for her resignation. Dr. Olsson further claims that Allen only withdrew her resignation after she received an outpouring of support from the Department's faculty members.

In June, Hatheway received a letter stating that the Joint Finance and Appropriations Committee awarded a five percent average Change in Employee Compensation, but listed Hatheway's hourly rate as $13.03, the same it had been the previous year. The letter does not give any reason for the lack of change in her salary, but Hatheway points to a University policy that precludes employees who receive "needs improvement" performance reviews from receiving automatic raises.

On April 30, 2007, Hatheway filed a University Problem Solving Request because of what she claims was an unwarranted and unsupported poor annual employment review, which

---

[2] It appears that Dr. Olsson's main concern was Hatheway complaining to other faculty members. That this concern was raised at the meeting with Hatheway is corroborated by Dr. Olsson's e-mail to the Director of Employment Services, April Preston. In this e-mail, Dr. Olsson states that "I walked through the evaluation with her. She wanted names, of course, but backed off immediately when I told her I would not provide them."

3

worsened her treatment in the Department. Dr. Olsson sent a letter to Hatheway summarizing their discussions during the problem solving session and explaining why he would not be increasing Hatheway's salary to match Allen's. On August 28, 2007, Hatheway filed a complaint with the Idaho Human Rights Commission claiming that Dr. Olsson gave her a poor performance review because of her age and then harassed and retaliated against her when she complained about discrimination. Hatheway claims that after filing her claim she continued to be isolated in her employment, left out of critical communications, and to have numerous essential job duties taken away from her.

Because of Hatheway's claims against Dr. Olsson, the Associate Dean prepared her performance evaluation for 2007, which contained two "needs improvement" ratings. In June, Hatheway received a letter stating that employees with an average or meets requirements performance rating would receive a 1% raise and that her hourly rate was $13.03, which was the same it had been the year before. A few days later, Hatheway received the same letter again, but it stated that her hourly rate would be $13.41.

Hatheway claims that she suffered severe emotional stress and anxiety over her working conditions, which resulted in dizziness and a rise in blood pressure. She tendered her resignation from the University on August 28, 2008.

Shortly after resigning her position at the University, Hatheway filed a claim against the University for age discrimination, hostile work environment, retaliation, and negligent infliction of emotional distress. The University filed a motion for summary judgment seeking to dismiss all of these claims. The district court granted the University's motion, finding that Hatheway failed to show that "she was discharged or was subjected to adverse decisions by her employer and, but for her age, the discharge or adverse decisions would not have occurred." Hatheway challenges this dismissal on appeal and asks this Court to reverse the district court's opinion and order.

## II. STANDARD OF REVIEW

Summary judgment must be entered when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). In reviewing the appeal of an order granting summary judgment, this Court applies the same standard as trial court. *Patterson v. State, Dep't of Health & Welfare*, 151 Idaho 310, 315, 256 P.3d 718, 723 (2011). This Court liberally construes disputed facts in favor of the nonmoving

4

party and "all reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party." *Id.* Summary judgment is appropriate when the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.*

### III. ANALYSIS

Hatheway brought several claims against the University under the Idaho Human Rights Act [IHRA] including claims for age discrimination, hostile work environment, and retaliation. She also brought a claim for negligent infliction of emotional distress. The district court dismissed all of Hatheway's claims and found that she failed to show that she was constructively discharged or that age was the "but for" cause of the alleged adverse employment actions.

**A. The district court correctly dismissed Hatheway's age discrimination claim.**

Hatheway brings her age discrimination claim for disparate treatment under the IHRA, which has the stated purpose of providing "for execution within the state of the policies embodied in the federal … Age Discrimination in Employment Act of 1967 [ADEA]…." I.C. § 67-5901. Both the federal and state acts provide that it is unlawful "to fail or refuse to hire, to discharge, or to otherwise discriminate against an individual with respect to compensation or the terms, conditions or privileges of employment" because of the individual's age. I.C. § 67-5909; 29 U.S.C. § 623(a)(1). Federal law guides this Court's interpretation of the IHRA. *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 123 Idaho 650, 653, 851 P.2d 946, 949 (1993).

This Court has held that to establish a prima facie case of age discrimination, Hatheway must demonstrate that: (1) she was an employee at least 40 years of age; (2) she was performing her job in a satisfactory manner; (3) her employer took adverse employment action against her; and (4) her position was filled by a younger person of equal or lesser qualifications. *Waterman v. Nationwide Mut. Ins. Co.*, 146 Idaho 667, 672, 201 P.3d 640, 645 (2009). Since *Waterman* was decided, the United States Supreme Court has established a heightened burden of proof for disparate treatment claims by requiring a plaintiff claiming intentional discrimination under the ADEA to prove that age was the "but-for" cause of the alleged adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) (holding that the "because of" language in the ADEA requires proof of "but-for" causation). Thus, Hatheway must ultimately establish that the University would not have taken the challenged action but for her age.

5

In this case, the district court concluded that under the ruling in *Gross*, "the third element of an age discrimination claim requires a plaintiff to demonstrate that 'but for' plaintiff's age, she would not have been discharged or would not have suffered from adverse actions by her employer." The district court then found that Hatheway failed to meet this element because she did not show that she had been constructively discharged or that her age was the "but-for" cause of her negative performance reviews or any other adverse actions Dr. Olsson may have taken. Hatheway argues that she presented both direct and indirect evidence that (1) constructive discharge and adverse employment actions occurred and (2) age was the "but-for" cause of those actions. Hatheway also argues that this Court should apply the burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to age discrimination cases, and that summary judgment was not appropriate in this case under that analysis.

Because federal law guides this Court's interpretation of the IHRA, we apply the quantum of proof and standards promulgated in discrimination cases arising under the ADEA. Thus, in cases where the plaintiff puts forward indirect evidence of age discrimination, the *McDonnell Douglas* burden-shifting analysis applies at the summary judgment stage. *See e.g.*, *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012) (citing *McDonnell Douglas*, 411 U.S. at 802–03). Since Hatheway has not put forward any direct evidence of age discrimination, we analyze her claim under the *McDonnell Douglas* burden-shifting framework.

This Court has previously applied the *McDonnell Douglas* burden shifting analysis to discrimination claims arising under the IHRA. *See e.g.*, *Bowles v. Keating*, 100 Idaho 808, 812, 606 P.2d 458, 462 (1979). In *Bowles* this Court stated that:

> [W]e accept the principle that a complainant may prove a prima facie unlawful discrimination case without proving an employer's intent to discriminate, thereby shifting the burden of producing evidence to the employer to give a lawful explanation for its treatment of the complainant.

*Id*. Thus, under this analysis, once the plaintiff succeeds in making out a prima facie case of age discrimination, the burden of production shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets this burden, the plaintiff has the burden of producing evidence to show that the proffered reason is in fact pretext for unlawful discrimination. *Bowles*, 100 Idaho at 814, 606 P.2d at 464. The burden of persuasion remains at all times with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

In this case, the district court erred in requiring Hatheway to present evidence of but-for causation as part of her prima facie case. "[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010). Simply establishing a prima facie case creates a rebuttable presumption of discrimination "because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Bowles*, 100 Idaho at 813, 606 P.2d at 463 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 573 (1978)). The purpose of applying the "*McDonnell Douglas* division of intermediate evidentiary burdens" is "to bring the litigants and the court expeditiously and fairly to [the] ultimate question" of whether the defendant intentionally discriminated against the plaintiff. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Requiring a plaintiff to put forward evidence of but-for causation at the prima facie stage eliminates the intermediate evidentiary burdens at the heart of the *McDonnell Douglas* analysis by forcing the plaintiff to immediately address the ultimate question. Accordingly, most courts apply *Gross*'s but-for causation standard at the pretext stage of the analysis, not the initial prima facie case. *See, e.g.*, *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010); *but see Shelley v. Geren*, 666 F.3d 599, 608 (9th Cir. 2012) ("At trial, [the plaintiff] must carry the burden to prove that age was the 'but-for' cause of his non-selection."). Therefore, the first question this Court must address is whether Hatheway has established a prima facie case of employment discrimination.

1. Prima Facie Case

The only element at issue in Hatheway's prima facie case is whether she has presented sufficient evidence to raise a material issue of fact as to whether she suffered an adverse employment action. Both the ADEA and I.C. § 67-5909 make it unlawful to discriminate against protected individuals in the compensation, terms, conditions, or privileges of employment. 29 U.S.C. § 623(a)(1); I.C. § 67-5909(1). Thus, adverse actions other than a discharge or refusal to hire may be an adverse employment action under those statutes. Hatheway first argues that the University's conduct made her working conditions so intolerable that she was forced to resign. Hatheway contends that even if this Court finds that the University's conduct was not sufficient to support her constructive discharge claim, the alleged conduct still constitutes adverse employment actions for the purposes of her disparate treatment claim.

*a. Constructive Discharge*

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Waterman*, 146 Idaho at 672, 201 P.3d at 645 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007)).

The Ninth Circuit has held that:

> [C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.

*Poland*, 494 F.3d at 1185 (citation omitted).

"Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury." *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996)). However, an isolated incident of mistreatment is not enough. *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir. 2000). In order to survive summary judgment, an employee must show "aggravating factors such as a continuing pattern of discriminatory treatment." *Id.* For example, in *Huskey* the Ninth Circuit found that an employee did not establish a continuing pattern of discrimination when he alleged that he experienced a lower performance evaluation, cold relationships with his supervisors and staff, harsh criticisms from his supervisors, reassignments, significantly reduced responsibilities, and was told that he should look for a new job and that if he stayed at the office, he would be sent to counseling. *See id.* at 896–98. The Ninth Circuit found that this conduct was not sufficiently intolerable to constitute a constructive discharge and upheld the district court's dismissal of the claim on summary judgment. *See id.* at 901.

Hatheway argues that three aspects of her working conditions, taken together, amounted to constructive discharge: (1) the University paid its new hire who was younger than Hatheway a

higher salary, although she had less tenure and less "Hay Points" than Hatheway; (2) after raising this issue with Dr. Olsson, Hatheway received back-to-back negative evaluations; and (3) after President White's speech about older workers needing to retire, the University began a pattern of behavior that affected Hatheway's conditions of employment. Hatheway claims that this pattern of behavior included Dr. Olsson keeping her out of the loop of communications, changing her work area without notice, failing to follow-up and have required meetings with her, and taking away several of her essential job functions.

This case is similar to *Huskey*, except that Hatheway's allegations are largely less severe than the plaintiff's allegations in *Huskey*. Taking all of the evidence in the light most favorable to Hatheway, she has not raised a material issue of fact as to whether she was constructively discharged. Like the employee in *Huskey*, Hatheway received negative performance evaluations and alleged cold working relationships with her supervisor. She does not present any facts that this conduct was discriminatory in nature. The only age related remarks that Hatheway points to were not directed at her. Therefore, Hatheway has not presented sufficient evidence to raise a material issue of fact on her constructive discharge claim.

*b. Adverse Employment Actions*

Since the University's actions are insufficient to constitute constructive discharge, the next question is whether its actions otherwise constitute adverse employment actions. In *Waterman*, this Court cited the United States Supreme Court's definition of a tangible employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Waterman*, 146 Idaho at 672, 201 P.3d at 645 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). This Court further cited to a Sixth Circuit case in which demotion without change in pay, benefits, duties, or prestige was insufficient. *Id.* (citing *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996)). Therefore, adverse employment actions in Idaho include significant changes in employment status that affect the employee's benefits or monetary compensation.

In this case, Hatheway does not claim that she was demoted, reassigned, or that her benefits were changed significantly. She claims that the following acts amount to adverse employment actions: being "kept out of the loop," being paid less than Allen, receiving negative employment evaluations, and having certain duties shifted away from her.

9

"Mere ostracism in the workplace" does not constitute an adverse employment action. *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996). Thus, her claim that she was "kept out of the loop" is not an adverse employment action.

While a reassignment with significantly different duties may be an adverse employment action, mere inconveniences or an alteration of job responsibilities are not adverse employment actions. *Jones v. Oklahoma City*, 617 F.3d 1273, 1279 (10th Cir. 2010). Hatheway claims that the following job duties have been taken away from her: (1) working with alumni; (2) maintaining and creating websites; (3) inventory tracking; and (4) the elimination of the decision to cross-train her position with the Financial Tech position. Even if true, the reallocation of these duties hardly amounts to a significant change in her employment. The University admits that tasks within the Department may shift depending on who was available and that Dr. Olsson sometimes performed clerical duties, but it asserts that Hatheway's job description was never revised. It further states that the reason she was less involved with alumni relations was because those functions were increasingly computerized by the central office. Hatheway does not claim that she was reassigned or that she has "significantly different responsibilities." Rather, she claims that "essential job duties" were taken away from her, but does not explain how any of the tasks she claims were taken away are essential to her job description. Viewing the evidence in the light most favorable to Hatheway, the removal of these job duties is not an adverse employment action.

Nor does the University paying Allen a higher salary than Hatheway constitute an adverse action. Rather, the University's only actions were hiring Allen, with Hatheway's approval, for a different position than Hatheway's, and negotiating a salary with Allen that was slightly higher than Hatheway's salary. Hatheway's salary was never lowered and Hatheway does not argue, nor does the record show, that hiring Allen at a different salary affected Hatheway's compensation in any way. The alleged fact that Hatheway had more "Hay Points" than Allen does not mean that Allen and Hatheway occupied the same position or were similarly situated. Hatheway bears the responsibility of showing that similarly situated co-workers were treated differently. *Burdine*, 450 U.S. at 258. In order to be similarly situated, the comparative employees must have been dealt with by the same supervisor, been subjected to the same standards, and have engaged in similar conduct. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Hatheway does not allege that she is similarly situated to Allen or that

10

she performed the same job, only that she has more "Hay Points." Therefore, the University's refusal to raise Hatheway's Assistant II salary to the same as Allen's Financial Tech salary is not an adverse employment action.

Finally, Hatheway claims that the two negative employment evaluations she received were adverse employment actions because receiving negative evaluations precludes an automatic pay raise and makes her eligible for being put on probation. Receiving "needs improvement" ratings in several categories on her annual employment evaluation did not lower Hatheway's salary, but it may have prevented her from receiving automatic pay raises. The only year Hatheway did not receive a pay increase was 2007, following her negative performance review from 2006.

Generally, formal criticism or poor performance evaluations alone are not adverse employment actions. *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999). However, a negative performance evaluation is an adverse employment action if it precludes the employee from receiving an automatic pay raise. *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) ("a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary"); *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996) (loss of a bonus is not an adverse employment action in cases where the employee is not automatically entitled to the bonus). Because the University does not dispute that Hatheway's negative employment evaluation precluded her from receiving an automatic pay raise, it constitutes an adverse employment action and she has succeeded in establishing a prima facie case for discrimination.

2. Hatheway has failed to establish a nexus between her negative employment evaluations and any discriminatory intent.

To overcome the inference of discrimination established by Hatheway's prima facie case, the University must articulate a nondiscriminatory reason for giving her negative employment evaluations. Hatheway does not dispute that the University met its burden. The University offered evidence to support its assertion that Hatheway received needs improvement ratings on several performance areas in her 2006 evaluation because of her continued unprofessional conduct of voicing her complaints and dislike of Allen and Dr. Olsson to others within the Department. Indeed, Hatheway's 2006 performance evaluation is very specific as to how

11

Hatheway failed to meet expectations. With regard to Hatheway's performance in the area of civility, an area she received a needs improvement rating, Dr. Olsson wrote:

> [T]his year there have been repeated instances of Lillian acting unprofessionally toward another staff member, and in venting about that person and the department chair in front of others in the unit. Against her co-worker, often when I have been away from the office, she has repeatedly launched tirades, it appears without provocation. These confrontations have not reflected civility or respect; they have sometimes merely been hurtful.

After praising Hatheway's initiative in addressing students' problems, Dr. Olsson provides a similar critique of Hatheway's unprofessional conduct in commenting on his needs improvement rating of Hatheway's performance in the area of "Innovation/Initiative/Problem Solving:

> When faced with things she does not like, however, she sometimes fails to exhibit like virtues; nor has she been effective in identifying areas for personal or organizational change. Here the venting referred to above, which has on occasion led to threats and inappropriate name-calling, solves nothing and only decreases her own and others' effectiveness, productivity, and service.

These explanations for the needs improvement ratings are legitimate and nondiscriminatory. Thus, we reach the final stage of the *McDonnell Douglas* analysis: whether Hatheway demonstrated that the University's proffered reasons are merely pretext for discrimination. A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. *Burdine*, 450 U.S. at 256. If Dr. Olsson honestly believed his reason for giving Hatheway a negative performance evaluation, Hatheway cannot meet her burden. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Generally, a plaintiff demonstrates pretext by showing that "the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

On appeal Hatheway does not dispute any of the behavior listed as grounds for her needs improvement rating. Rather, she points to the lack of any previous negative performance evaluations, her nomination for employee of the year, and certain age-related comments as proof that Dr. Olsson's proffered reasons are merely pretext. To survive summary judgment, Hatheway must provide sufficient evidence from which a jury could reasonably find that, but for her age, she would not have received a negative performance evaluation. She has failed to meet this burden.

12

Past positive performance reviews are not sufficient evidence alone to rebut the reasons given for Hatheway's negative 2006 performance review. *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."). Neither her positive performance review, which was based mainly on a time period before Allen was hired, nor her nomination for employee of the year rebut Dr. Olsson's assertion that Hatheway complained about Allen and Dr. Olsson in an unprofessional manner. Hatheway must establish a nexus between Dr. Olsson's allegedly discriminatory motive and the negative review she received. *See Waterman.*, 146 Idaho at 673, 201 P.3d at 646. Stray remarks are insufficient. *Id*. Thus, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself are not sufficient to satisfy Hatheway's burden of demonstrating animus. *Blizzard v. Marion Tech. College*, 698 F.3d 275, 287 (6th Cir. 2012); *Ezold*, 983 F.2d at 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight....").

Hatheway points to three incidents to support her assertion that Dr. Olsson's reasons for giving her a negative performance review were merely pretextual: (1) President White's May 2006 state of the University address in which he stated that employees should get "out of the way" for "a young entry level or midcareer person" when they become less productive; (2) Dr. Olsson stating during a faculty meeting that he was looking for a "young and energetic" person to fill the coordinator position for the Masters of Fine Arts Program; and (3) Dr. Olsson asking Hatheway whether she was coming back after her vacation.

Neither of the first two statements relate to Hatheway's employment or to her negative performance evaluations. It is questionable that the President of the entire University would be considered the decisionmaker as to Hatheway's performance evaluations. Moreover, his statements are ambiguous because they could easily relate to tenure. *See Blizzard*, 698 F.3d at 287 (holding that employer's statements to the plaintiff that "most of the people here are the old people like you" and that another employee had "been in his job too long" were ambiguous because they could easily refer to tenure). Such comments absent any context or evidence of intent do not establish a nexus between the employer's alleged discriminatory motive and the adverse actions the employee suffered. *Waterman*, 146 Idaho at 673, 201 P.3d at 646 (comments referring to the employer as a "young company" did not establish discriminatory intent).

13

Similarly, age-related comments made by the decisionmaker about another employee do not establish the necessary nexus absent any other evidence contradicting the employer's legitimate employment reasons. *See O'Connor v. DePaul Univ.*, 123 F.3d 665, 671–72 (7th Cir. 1997) (finding age-related comments made about different employees were alone insufficient to establish pretext where plaintiff was dismissed for writing harassing letters to a co-worker).

While the third comment Hatheway points to at least relates to her employment, it does not establish discriminatory intent on Dr. Olsson's part. A single inquiry by an employer as to an employee's plans for retirement does not necessarily show animosity towards age. *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 28 (1st Cir. 1995). Giving Hatheway the benefit of any inferences that can be drawn, as we must when reviewing a grant of summary judgment, these comments taken together might hint at discrimination. However, a rational jury could not say they are sufficient to show, by a preponderance of the evidence, that discrimination was the "but-for" cause of Hatheway's negative performance evaluations. Without presenting any evidence to contradict the core facts put forward by Dr. Olsson as the legitimate reason for his evaluation, these comments are insufficient to establish pretext.

Although Hatheway has established a prima facie case of age discrimination, she has failed to show that the University's proffered reasons for her negative performance evaluation were pretextual. Therefore, we affirm the district court's grant of summary judgment regarding Hatheway's age discrimination claim.

**B. The district court correctly dismissed Hatheway's hostile work environment claim.**

To establish a prima facie hostile work environment claim, a plaintiff must raise a triable issue of fact as to whether "the workplace [was] permeated with discriminatory intimidation, ridicule, and insults that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, (1993) (internal quotations and citation omitted). "The working environment must both subjectively and objectively be perceived as abusive." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)). To determine whether a hostile work environment exists, courts look to all of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Hatheway contends that the same facts that support her constructive discharge claim also support her hostile work environment claim. She claims that the alleged conduct was sufficiently severe or pervasive that it altered the conditions of her employment. However, the majority of what Hatheway alleges as conduct that altered the conditions of her employment was not discriminatory, but rather amounts to no more than getting the cold shoulder. She does not explain how this conduct was severe or pervasive nor does she cite any case law in support of her argument. Therefore, this Court affirms the district court's dismissal of Hatheway's hostile work environment claim on summary judgment.

**C. The district court correctly dismissed Hatheway's retaliation claim.**

The IHRA prohibits retaliation against persons who file a complaint alleging discriminatory actions prohibited under the IHRA. I.C. § 67-5911. Idaho Code Section 67-5911 provides that:

> It shall be unlawful for a person or any business entity subject to regulation by this chapter to discriminate against any individual because he or she has opposed any practice made unlawful by this chapter or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

"A claim under I.C. § 67-5911 is commonly referred to as a retaliation cause of action." *Patterson v. State, Dept. of Health & Welfare*, 151 Idaho 310, 318, 256 P.3d 718, 726 (2011). In order to establish a prima facie retaliation claim, Hatheway must demonstrate that: "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action." *Id.* Protected activities include: "(1) opposing an unlawful employment practice; and (2) participating in a statutorily authorized proceeding." *Id.* To prove the "adverse employment action" element of a retaliation claim a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse," i.e., that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted). The causal link element "may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Jordan v. Clark,* 847 F.2d 1368, 1376 (9th Cir. 1988) (internal quotation marks omitted). Thus, a retaliatory motive for adverse employment

15

actions may be inferred when they occur "fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir. 2002).

Hatheway contends that she engaged in protected activities when she filed a problem solving request with the University that notified its compliance officer about her perceived age discrimination and when she filed her age discrimination claim with the Idaho Human Rights Commission. She then argues that she suffered adverse employment actions after engaging in these protected activities, which included "poor evaluations, isolation, failure to receive increases in pay, and removal of her employment duties." While Hatheway has engaged in protected activity, she has not demonstrated either that she was subjected to an adverse employment action or a causal link between the protected activities and the alleged retaliatory action.

The district court concluded that the chronology of Hatheway engaging in protected activity as compared to the alleged adverse employment actions does not support her retaliation claim. In relevant part the district court stated:

> Ms. Hatheway filed her Problem Solving Request Form with the University on April 30, 2007; she met with the University's human rights compliance officer on May 30, 2007, and she filed her complaint with the Idaho Human Rights Commission on August 29, 2007. After Ms. Hatheway had engaged in the listed activities, she received a performance evaluation that included only two "needs improvement" ratings, a significant decrease from the thirteen "needs improvement" ratings she received prior to engaging in the listed activities. In addition, in 2008 Ms. Hatheway received a 3% wage increase. The evidence simply does not support Ms. Hatheway's claim of retaliation. While her perception that Dr. Olsson avoided communicating with her and that her job responsibilities had changed to some degree may be accurate, there is no evidence that the University retaliated against her because she engaged in protected activities.

Thus, the majority of the adverse employment actions she alleges actually occurred before she engaged in any protected activity. While her 2007 employment evaluation was not quite as good as it had been in 2005, it was better than the year before and it did not cause her to lose an automatic pay raise. The remaining adverse employment actions she claims, isolation and removal of employment duties, are not adverse for the purposes of her retaliation claim. Nor has she shown any change in these activities from before and after she engaged in protected activity. Therefore, we affirm the district court's grant of summary judgment on this claim as Hatheway has failed to establish all of the elements of her prima facie case.

**D. The district court correctly dismissed Hatheway's negligent infliction of emotional distress claim.**

Idaho recognizes the tort of negligent infliction of emotional distress where the employer owes the employee a legal duty. *Nation v. State, Dep't of Corr.*, 144 Idaho 177, 191, 158 P.3d 953, 967 (2007). A legal duty is one recognized by law that requires the defendant to conform to a certain standard of conduct. *Id.* at 189, 158 P.3d at 965. The IHRA does create certain duties for employers, the violation of which could form the basis of a negligent infliction of emotional distress claim. Hatheway contends that because the district court erred in dismissing her claims under the IHRA, it also erred in dismissing her negligent infliction of emotional distress claim.

Because we affirm the dismissal of all of Hatheway's claims under the IHRA, we affirm the dismissal of Hatheway's emotional distress claim.

## IV. CONCLUSION

We affirm the district court's judgment dismissing all of Hatheway's claims. Costs to the University.

Justices EISMANN, J. JONES, W. JONES and HORTON, **CONCUR.**